**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH A. NICKLES-BURKHOLDER, | ) | CASE NO:  5:11-cv-0848 |
| | ) | |
| Plaintiff, | ) | JUDGE OLIVER |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Sarah A. Nickles-Burkholder ("Nickles") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Nickles' claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the magistrate judge pursuant to Local Rule 72.2(b).

For the reasons set forth below, the decision of the Commissioner should be **AFFIRMED**.

I.  Procedural History

On April 2, 2004, Nickles filed an application for DIB and SSI alleging disability as

of September 10, 2002[1] due to a loss of sensation in her left leg secondary to back pain. Nickles' application was denied initially and upon reconsideration. Nickles timely requested an administrative hearing.

On May 8, 2006, Administrative Law Judge Dean K. Franks ("ALJ Franks") held a hearing during which Nickles, represented by counsel, testified. Lynn Smith testified as the vocational expert ("VE"). On June 29, 2006, ALJ Franks found Nickles was able to perform a significant number of jobs in the national economy, and therefore, was not disabled. He found that Nickles' spinal stenosis with degenerative impairments was a severe impairment but that her impairment did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. He further found that Nickles has the residual functional capacity ("RFC") for a limited range of light work. ALJ Franks then used the Medical Vocational Guidelines ("the grid") and the VE's testimony to determine that Nickles is not disabled. ALJ Franks' decision became the final decision of the Commissioner when the Appeals Council declined further review.

Nickles filed an appeal to this court on May 25, 2007. Nickles argued on appeal that ALJ Franks erred by (1) failing to evaluate whether Nickles met or equaled Listing 1.04(A); (2) making an RFC finding that was not supported by substantial evidence; (3) relying on the VE's testimony where the hypothetical posed to the VE was inaccurate; and (4) failing to call a medical expert ("ME") to testify at the hearing. On May 13, 2008, the court vacated the decision of the Commissioner, finding that ALJ Franks' decision was not supported by substantial evidence because he failed to give good reasons for

---

[1] At the initial hearing, Nickles' attorney amended the alleged disability onset date to May 1, 2003. Tr. at 14.

2

rejecting the opinion of Nickles' treating physician. *Nickles v. Astrue*, Case No. 5:07-cv-1542 (N.D. Ohio Feb. 29, 2009). The court remanded the case for further proceedings.

On remand, the Commissioner assigned the case to Administrative Law Judge Mark Carissimi ("ALJ Carissimi" or "ALJ"). ALJ Carissimi accepted additional evidence from Nickles. He held a hearing on November 5, 2008 at which Nickles was represented by counsel and testified on her own behalf. Nickles' husband and Malcolm A. Brahms, M.D. ("the ME"), also testified at the hearing. On January 28, 2009, ALJ Carissimi determined that Nickles was not disabled during her insured period. When the Appeals Counsel declined further review, ALJ Carissimi's decision became the final decision of the Commissioner.

On April 29, 2011, Nickles filed in this court an appeal of the Commissioner's decision. Nickles argues that ALJ Carissimi erred because he (1) failed to give appropriate weight to the opinions of Nickles' treating physician; (2) improperly found Nickles not to be credible; (3) did not accept the opinion of the VE in response to the hypothetical properly incorporating the opinion of the treating physician regarding Nickles' functional capacity, and (4) failed to follow the court's orders on remand. The Commissioner denies that ALJ Carissimi erred.

## II. Evidence

A.    Personal and Vocational Evidence

Nickles was born on September 25, 1980 and was 22 years old on her alleged onset date. She is, therefore, a "younger" person within the meaning of the Act. *See* 20 C.F.R. § 404.1563(c) & 416.963(c). Nickles has a high school education and does not have any past relevant work.

3

B.     Medical Evidence

On September 10, 2002, Nickles visited Norton A. Winer, M.D., complaining of prickly and numb sensations on the left lateral thigh.  Tr. at 199-204.  Testing revealed normal strength in all extremities but hyperalgesia, allodynia, and hyperathia in the cutaneous distribution of the left lateral femoral cutaneous nerve.  Reflexes were equal bilaterally.  Nickles had full range of motion and the ability to heel and toe walk.  *Id.*  Dr. Winer opined that Nickles' examination was consistent with left meralgia paresthetica, which was most likely secondary to compression of the left lateral femoral cutaneous nerve as it passes over the pelvic rim.  Dr. Winer advised Nickles that the sensory abnormality may last for three to four months and recommended Neurontin.

On October 10, 2002, Nickles again visited Dr. Winer.  Tr. at 197-198.  Dr. Winer noted that an EMG and nerve conduction velocity study were indicative of either meralgia paresthetica or lumbar radiculopathy.  On May 11, 2003, a CAT scan demonstrated a mild diffuse disc bulge at L5-S1 with mild narrowing of the canal and the neural foramina.  Tr. at 130.

Dr. Winer referred Nickles to Rajiv V. Taliwal, M.D., an orthopedic surgeon, in May 2003 to address pain in her back and numbness in her buttocks and posterior thighs and calves.  Tr. at 134.  Dr. Taliwal diagnosed lumbar sponylolysis with leg radiculopathy.  His treatment suggestions included physical therapy and weight reduction.

On September 18, 2003, Jeffrey S. Tharp, D.O., examined Nickles. Tr at 169-70.  Dr. Tharp noted that Nickles walked with a relatively normal gait and had good strength with heel and toe ambulation.  X-rays revealed spondylisis at L5 bilaterally with mild

4

narrowing of the L5 disc space.  Nickles' reflexes were normal, response to pinprick,

motor strength, and straight leg raise were normal.  Dr. Tharp's impression was

ischemic spondylisis at L5 bilaterally with lumbar disc disease causing mechanical back

pain.

On October 3, 2003, Nickles underwent an MRI of the lumbar spine.  Tr. at 137.

The MRI indicated normal vertebral height, alignment, and marrow signal, but also

indicated desiccation of the L5-S1 disc without disc space narrowing.  There was a mild,

broad-based, diffuse disc bulge at L5-S1 without central canal stenosis, thecal sac

compression, nerve root compression, or foraminal stenosis.  Mild, bilateral facet

hypertrophic changes were seen at L4-5 and L5-S1.

On October 9, 2003, Dr. Tharp saw Nickles and reviewed the results of the MRI.

Tr. at 167.  He planned an EMG to determine if Nickles was suffering from radicular

pain.  Nickles subsequently failed to appear for three scheduled visits.

On October 16, 2003, Steven Cremer, M.D., examined Nickles.  Tr. at 162.  The

examination revealed normal reflexes, motor strength, and sensation.  Straight leg

raising was negative, but lumbar range of motion was limited with moderate paraspinal

tenderness.  Nerve conduction studies of Nickles' lower extremities revealed no

abnormalities.

On February 19, 2004, Mark Verdun, D.O., examined Nickles and found she had

full range of motion of her lumbar spine with pain and tenderness to palpation over the

lumbosacral junction.  Tr. at 142.  Strength and reflexes were normal in both lower

extremities.  Nickles had decreased sensation in her left thigh.  Single leg raise was

negative.  After examining the MRI performed in October 2003, Dr. Verdun diagnosed

degenerative disc disease at L5-S1, herniated nucleus pulposus at L4-5, and spinal stenosis.  He recommended aquatic and land-based physical therapy and an increased dosage of Celebrex and, if necessary, bracing and epidural blocks.  If conservative treatment was not effective, Dr. Verdun stated that he would consider surgery.

Between March and April of 2004, Nickles attended a few physical therapy sessions and reported slight pain reduction with therapy.  Tr. at 145-49.  However, Nickles failed to attend several scheduled sessions.

On April 22, 2004, Nickles told Robert J. Hampton, M.D., that she was "no better, though she does get some temporary relief when she goes to physical therapy."  Tr. at 141.  Dr. Hampton scheduled Nickles for epidural blocks and recommended continuing physical therapy.

On October 8, 2004, Gerald W. Klyop, M.D., reviewed Nickles' medical records for the Bureau of Disability Determination ("the Bureau") and completed an RFC Assessment form.  Tr. at 153-60.  He concluded that Nickles could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour day, sit about six hours in an eight-hour day, and could occasionally climb, balance, stoop, kneel, crouch or crawl.

On October 24, 2005, Dr. Hampton informed Nickles that he would no longer treat her after she missed three scheduled appointments.  Tr. at 172-73.

On November 15, 2005, Dr. Winer examined Nickles and opined that she was slightly obese and in some mild distress.  Tr. at 190-94.  He found that Nickles had good leg strength, but had some pain in her left leg on straight leg raising at 90∘ and some pain with left lateral flexion of the lumbosacral spine.  X-rays of Nickles' lumbar spine

6

revealed no abnormality.  Dr. Winer's impression was low back strain and probable
recurrent left lumbar radiculopathy.  He recommended Naproxen and Soma and
planned an EMG.

On November 28, 2005, Dr. Winer reported that a lumbar MRI showed lumbar
disc disease at L4-5 and L5-S1.  Tr. at 182-85.  He also completed a Residual
Functional Capacity Questionnaire.  Dr. Winer opined that Nickles could work for eight
hours a day with four hours of sitting, one hour of standing, and one hour of walking.
He also found that Nickles could occasionally lift and carry up to 10 pounds, could
occasionally bend, reach, stoop, and crouch, but could never squat, crawl, climb, or
kneel.  He opined that Nickles should not be exposed to unprotected heights and could
occasionally be exposed to moving machinery, temperature changes, dust/fumes/
gases, and noise.  She also would be unable to use her left foot for repetitive
movements in operating foot controls.  According to Dr. Winer, Nickles had no
manipulative restrictions in her hands.  Dr. Winer also stated that muscle spasms are an
objective sign of Nickles' pain and that her pain is of moderate severity, which would
cause marked handicap in the performance of the activity precipitating the pain. Finally,
Dr. Winer estimated that Nickles' conditions would cause her to miss work about twice a
month.

On January 17, 2006, an EMG and a nerve conduction study indicated probable
bilateral L4-5 and L5-S1 radiculitis.  Tr. at 176-77.  Dr. Winer noted positive straight leg
raising on the left at an unspecified angle, scheduled Nickles for a lumbar nerve block,
and prescribed Darvocet and Flexeril.  Tr. at 175.

On April 26, 2006, an MRI of Nickles' lumbosacral spine indicated degenerative

changes with a moderate, centrally-directed bulge of the disc at L5-S1.  Tr. at 215.  A consulting radiologist, Albert Cook, M.D., indicated that the bulge did not appear to be impinging on the right nerve root.

On April 25, 2006, Dr. Winer completed a second Residual Functional Capacity Questionnaire.  Tr. at 206-08.  Dr. Winer opined that Nickles could perform four hours of work in an eight-hour work day, including four hours of sitting and one hour of standing/walking.  He indicated on the form that this was a correction of his earlier estimate of how many hours Nickles could work in an eight-hour workday.  He also added that Nickles was positive for a left single leg raise at 40∘.  Otherwise, Dr. Winer reasserted the same limitations described in the questionnaire completed in November 2005.  Dr. Winer again indicated that Nickles suffered from muscle spasms and moderate pain, which would cause her to be absent from work about twice per month.

After this court remanded the case for further proceedings and before the second hearing, Nickles submitted the following additional evidence in support of her claim.  Tr. at 318-370.  Clinical notes from a visit to Portage Family Medicine ("Portage") on February 20, 2006 indicate that Nickles has had chronic low back pain since the epidural given to her at her last childbirth in September 2005.  Tr. at 368.  According to the notes, the numbness from the epidural never left her left leg, and she also has trouble with pain in that leg.

On March 31, 2006, Nickles reported to Portage complaining of back and pelvic pain upon urination.  Tr. at 366.  She was diagnosed with a urinary tract infection, and a prescription for Levaquin was renewed.  Nickles continued to complain of low back and pelvic pain on April 18, 2006.  Tr. at 365.

8

On March 22, 2007, Nickles underwent a laparoscopy on the basis of her continued complaints of pelvic pain.  Tr. at 326.  The procedure showed a normal uterus with small vesicular lesions, which were removed.

Nickles visited the emergency room of Robinson Memorial Hospital complaining of back pain after the insertion of an IUD four days earlier.  Tr. at 324-25.  After an examination, the attending physician diagnosed a urinary tract infection and prescribed and administered Cipro.

On June 19, 2008, Nickles reported to Portage complaining of back and neck pain that had been increasing for two weeks.  Tr. at 352.  The examining physician detected tenderness and spasms over the cervical and lumbar paravertebral muscles, and Nickles reported pain upon a straight left leg raise.  An x-ray of the lumbar spine taken on June 23, 2008 showed no abnormalities.  Tr. at 323.

An MRI performed on September 2, 2008, showed "degenerative disc disease at L5-S1 with mild anterolisthesis and disc bulge extending into the neural foramina."  Tr. at 322.  The MRI also revealed a disc bulge at L5-S1 extending into both neural formina, accompanied by moderate bilateral facet hypertrophy, and mild bilateral neural foraminal narrowing.  There was also mild to moderate ligamentum flavum and facet hypertrophy at L3-L4 and L4-L5.

Nickles reviewed the results of her MRI with Ann Meyer, D.O., at Portage on September 8, 2008.  Tr. at 348.  An examination revealed lumbar flexion limited to 10 degrees without pain, positive right straight leg raising to 40 degrees without back pain, and positive left straight leg raising to 30 degrees without back pain.  Nickles reported that the pain produced by left leg raising radiated from her back down her left leg.  Dr.

9

Meyer diagnosed lumbar strain and a herniated disc.  She continued a prescription Flexeril, added Ultram, and told Nickles to avoid heavy lifting.  Dr. Meyer also noted that she would like Nickles to see an orthopedist as soon as possible.

On September 11, 2008, Nickles visited Dr. Tharp complaining of lower back and bilateral leg pain.  Tr. at 343-44.  Examination revealed normal strength, stability, and range of motion and negative straight leg raise but diminished sensation.  After reviewing Nickles' MRI, Dr. Tharp diagnosed lumbar disc disease, spondylolisthesis that could be ischemic, spinal stenosis, mechanical back pain, and radiculopathy into the lower leg.  He recommended epidural steroid injections and a back support brace but noted that surgery was a possibility if more conservative measures failed.  Dr. Tharp also noted that because Nickles was four months postpartum, "surgical intervention would be her last resort."  Tr. at 344.

C.      Hearing Testimony

1.      The initial hearing

At the first hearing, Nickles testified that she had worked at Home Depot as a cashier/stocker in 2002 but that she stopped working when she became pregnant.  Tr. at 226.  She had two children, one eight months old and the other three years old.  Tr. at 230.  Her husband and her family helped her care for the children.  Tr. at 230-31.  According to Nickles, she cannot work because she cannot "do anything without having excessive pain."  Tr. at 227.  She testified that her pain extended from her back to her neck and to her left leg.  Tr. at 227.  Nickles reported spasms, numbness, and, at times, an inability to walk.  Tr. at 227.  She told the court that her condition was the same as it had been in May 2003.  Tr. at 227-28.

10

Nickles testified that her medications often caused dizziness, fatigue, and stomach problems. Tr. at 230-36. She said that sometimes she avoided taking those medications with the worst side effects so that she could attend to her daily needs and her children. Tr. at 230. She denied having received epidural injections and asserted that she was "against" them because she heard they were addicting and did not cure problems. Tr. at 232. According to Nickles, she stopped going to physical therapy because it was not helping alleviate pain. Tr. at 232. She also claimed that she wanted to avoid surgery because she was afraid of the risks involved. Tr. at 238.

Nickles told the court that she went grocery shopping with her husband, did light cooking, and helped with the dishwasher. Tr. at 238-39. She also fed her children, played with them, and did other light activities. Tr. at 230. She limited her lifting: She briefly lifted her children to transfer them to chairs but she could not lift a gallon of milk or groceries. Tr. at 231, 241. She estimated that she could walk "[l]ess than a couple houses without hurting my left leg" and could sit for "[m]aybe five minutes." Tr. at 233. She said that talking on the phone hurts her neck, and neck pain had recently begun to cause headaches. Tr. at 239. Nickles also said that she could not sit in a chair with too much cushioning because it caused pain and spasms. Tr. at 240. According to Nickles, she was able to function less than two hours per day. Tr. at 240-41.

ALJ Franks gave the VE the following hypothetical. Assume an individual with a high school education and no past relevant work; who could lift 20 pounds occasionally and 10 pounds frequently; and who could perform occasional postural movements including stooping, kneeling, crawling, crouching, climbing, or balancing. Tr. at 241. When asked if there was work for such an individual, the VE testified that the specified

limitations did not significantly erode the full range of light work. Tr. at 241-42. The VE said that such an individual could perform light, unskilled jobs such as information clerk or mail clerk. Tr. at 242. ALJ Franks then asked the VE to assume a person who could lift or carry up to ten pounds; who required a stand/sit option; and who could occasionally bend, reach, stoop, or crouch. When asked if there was work for such an individual, the VE testified that such a person could perform some sedentary, unskilled jobs such as ticket checker or polisher of eye-glass frames. Tr. at 242-43.

In response to a question posed by Nickles' attorney, the VE testified that it would be hard for either of the individuals described in the ALJ's hypotheticals to maintain employment if they missed three or more days of work per month due to medical problems. Tr. at 243-44. Nickles' attorney asked the VE what impact the addition of a sit/stand option would have on ALJ Franks' first hypothetical. Tr. at 246. The VE responded that such an individual could perform the job as an information clerk and other jobs, such as office helper, but could not perform the job as a mail clerk. Tr. at 246-47.

2. Hearing upon remand

At the second hearing on November 5, 2008, Nickles testified that she had not worked since the previous hearing and that the pain in her lower back, leg, and neck had gotten worse over the past two years. Tr. at 378, 393-95. She wore a back brace to the hearing and told the court that she had been having more frequent "bad days," as many as three or four per week. Tr. at 388, 393. On "bad days," according to Nickles, she cannot get out of bed or it takes a couple of hours to get motivated. Tr. 385, 367. Nickles also described suffering side effects from her medication, particularly Flexeril,

12

which makes her dizzy and knocks her out.  Tr. at 388.  She said that although she has

a prescription for Vicodin, she does not usually take it because it makes her dizzy and

unable to take care of her children.  Tr. at 389.

Nickles told the court that she has three children, the oldest being six years old

and the youngest weighing 16 pounds.   Tr. 378, 381, 390.  According to Nickles, she

spends most of the time at home, but she is able to drive if she has to.  Tr. at 380. She

drives to the store a couple of times per week to pick up small items while her husband

shops for heavy items.  Tr. at 381-382, 386.  Nickles said that she does light work

around the house but that her husband helps with the heavier cleaning, including

dishes, laundry, and vacuuming.  Tr. at 385-86.  Her friends also help out around the

house most evenings while her husband is working.  Tr. 387, 392.

Nickles testified that she can lift a gallon of milk, but it "hurts really bad."  Tr. at

389-390.  She can pick up her 16-pound baby when she has to.  Tr. 390, 391. When

she can, Nickles puts the baby in a swing or playpen.  Tr. at 391.  Nickles declared that

she can only stand for about five to ten minutes due to back pain, spasms, and leg

weakness.  Tr. at 393.  She also said that because she cannot walk a city block, she is

unable to accompany her children on Halloween for trick-or-treating.  Tr. at 393-394.

She also claimed that she can sit for less than thirty minutes, which prevents her from

taking long car rides.  Tr. at 393.

Plaintiff's husband, Adrian Burkholder ("Burkholder"), also testified at the hearing.

He said that on a normal day, he helps his wife by taking out the garbage, unloading the

dishwasher, and transferring the clothes from the washer to the dryer.  Tr. at 398.  He

also said that he has come home from work sometimes to help out and that when he is

13

working, his wife needs help from others.  Tr. at 399.  He further testified that Nickles

stacks things around the house so that she can reach them without bending.  Tr. at 399.

The ME testified that Nickles was capable of performing light work with

occasional balancing, stooping, kneeling, crouching, crawling.  Tr. at 403.  He did not

limit Nickles to non-repetitive work or limit her to a sit-stand option.  Tr. at 411.  The ME

disagreed with Dr. Winer's assessment of Nickles' RFC based on such evidence as the

results of Nickles' MRI and EMG studies and physical examinations.  Tr. at 404.  He

acknowledged that Nickles has degenerative changes consistent with arthritis, but he

stated that she does not have degenerative disc disease, a herniated disc, or nerve

compression.  Tr. at 405-06, 408.  He did agree that Nickles suffered from a disc bulge,

and that there was evidence of nerve irritation, probably secondary to degenerative

changes.  Tr. at 407-08.  He denied that there was any evidence of sensory or reflex

loss, but he agreed that there was objective evidence of radiculopathy.  Tr. at 408, 410.

He concluded that Nickles' subjective complaints were not consistent with the record.

Tr. at 411-12.  The ME conceded, however, that the experience of pain varies from

patient to patient and that some patients with Nickles' conditions claim to be

experiencing as much pain as Nickles was claiming.  Tr. at 411-13.  He stated that his

testimony describes what the average patient would experience given Nickles'

conditions.  Tr. at 412-13.

### III.  Standard for Disability

A claimant is entitled to disability benefits under the Act only if (1) she has a

disability; (2) she was insured when she became disabled; and (3) she filed while she

was disabled or within twelve months of the date the disability ended.  42 U.S.C.

§ 416(i)(2)(E); 20 C.F.R. § 404.320.

Nickles was insured on her alleged disability onset date, May 1, 2003 and remained insured through June 30, 2003. (Tr. 21.) Therefore, to be entitled to benefits, Nickles must establish a continuous twelve month period of disability commencing between May 1, 2003 and June 30, 2003. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

In addition to demonstrating that she was ensured during the relevant period, a claimant must also establish disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last

15

for at least twelve months, and the impairment meets a listed impairment, the claimant
is presumed to be disabled regardless of age, education or work experience. 20 C.F.R.
§§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not
prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth
step, even if the claimant's impairment does prevent her from doing her past relevant
work, if other work exists in the national economy that the claimant can perform, the
claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

In determining that Nickles was not disabled, ALJ Carissimi made the following
relevant findings:

> 1.      [Nickles] met the insured status requirements of the Social Security Act
> through June 30, 2003.

> 2.      [Nickles] has not engaged in substantial gainful activity since September
> 10, 2002, the alleged onset date.

> 3.      [Nickles] has the following severe impairments: lumbar degenerative disc
> disease.

> 4.      [Nickles] does not have an impairment or combination of impairments that
> meets or medically equals one of the listed impairments in 20 CFR Part 404,
> Subpart P, Appendix 1.

> 5.      After careful consideration of the entire record, I find that [Nickles] has the
> residual functional capacity to perform light work as defined in 20 C.F.R.
> 404.1567(b) and 416.967(b) with restrictions.  Specifically, she is able to lift,
> carry, push, and pull 20 pounds occasionally and 10 pounds frequently.  She is
> able to sit for six hours of an eight-hour workday and stand and/or walk for six
> hours of an eight-hour workday.  She cannot climb ladders, ropes or scaffolds.
> She can occasionally climb ramps or stairs.  She can occasionally balance,
> stoop, kneel, crouch, and crawl.

> 6.      [Nickles] has no past relevant work.

> 7.      [Nickles] was born on September 25, 1980 and was 21 years old, which is

defined as a younger individual age 18-49, on the alleged disability onset date.

8.      [Nickles] has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not an issue in this case because [Nickles'] past relevant work is unskilled.

10.     Considering [Nickles'] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Nickles] can perform.

11.     [Nickles] has not been under a disability, as defined in the Social Security Act, from September 10, 2001 through the date of this decision.

Tr. at 264-72.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Nickles claims that ALJ Carissimi erred because he (1) failed to give appropriate

17

weight to the opinions of Nickles' treating physician; (2) improperly found Nickles not to be credible; (3) did not accept the opinion of the VE in response to the hypothetical properly incorporating the opinion of the treating physician regarding Nickles' functional capacity, and (4) failed to follow the court's orders on remand. The Commissioner denies that ALJ Carissimi erred.

A.      *Whether ALJ Carissimi erred by failing to give appropriate weight to the opinion's of Nickles' treating physician*

Nickles argues that the ALJ erred in discounting Dr. Winer's opinions because ALJ Carissimi made many factual errors in discounting those opinions. The opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983). This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988). Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986). Nevertheless, the ALJ must provide "good reasons" for the weight assigned to treating physicians. Failure to do so does not constitute harmless error and requires remand. *Wilson v. Commissioner of Social Security*, 378, F.3d, 541, 544 (6th Cir. 2004).

18

On April 26, 2006, Dr. Winer revised his RFC assessment of November 28, 2005 after having reviewed a new MRI of Nickles' lumbosacral spine.  He also found that Nickles could occasionally lift and carry up to 10 pounds, could occasionally bend, reach, stoop, and crouch, but could never squat, crawl, climb, or kneel.  He opined that Nickles should not be exposed to unprotected heights and could occasionally be exposed to moving machinery, temperature changes, dust/fumes/ gases, and noise.  She also would be unable to use her left foot for repetitive movements in operating foot controls.  According to Dr. Winer, Nickles had no manipulative restrictions in her hands.  He also stated that muscle spasms were an objective sign of Nickles' pain, that she had pain at 40∘ of left straight leg raising, and that her pain is of moderate severity, which would cause marked handicap in the performance of the activity precipitating the pain.  Finally, Dr. Winer estimated that Nickles' conditions would cause her to miss work about twice a month.

In evaluating Dr. Winer's opinions regarding Nickles' RFC, ALJ Carissimi wrote as follows:

> Dr. Winer's opinions are inconsistent with his own treatment notes and with the evidence as a whole.  Dr. Winer indicated that positive straight leg raise testing was an objective sign of [Nickles'] pain in both opinions.  In the April 2006 opinion, he indicated that the straight leg raise testing was positive at 40 degrees.  However, on November 15, 2005, Dr. Winer indicated that [Nickles'] straight leg test was positive at 90 degrees on the left, which is generally considered to be a negative straight leg test.  A January 17 2006 treatment note indicates straight leg testing was positive, but does not state to what degree.  Dr. Winer does not explain the severity of the restrictions he proposes.  I note that other examining and treating physicians have, upon examination, found [Nickles] to have full motor strength, full range of motion in the spine and extremities, intact sensation, equal reflexes, and negative straight leg raise testing.  At the November 2008 hearing, Dr. Brahms testified that he disagreed with Dr. Winer's opinion.  He explained that Dr. Winer's assessment of [Nickles'] work capacity was not supported by objective findings, MRI scans of the lumbar spine, physical

19

> examinations or the electromyography and nerve conduction studies of record. In sum, Dr. Winer's opinions are inconsistent with the evidence and are given less weight.

Tr. at 267-68.

ALJ Carissimi's description of the facts in the record is problematic in three respects.  First, the assertion by the ALJ that physicians other than Dr. Winer have found Nickles' sensation to be intact is an overstatement.  February 19, 2004 examination notes by Dr. Verdun, clinical notes from a visit to Portage indicating that Nickles had some numbness in her left leg since her epidural in September 2005, and September 11, 2008 examination notes by Dr. Tharp all indicated problems with sensation.  Second, the assertion that "other examining and treating physicians have, upon examination, found [Nickles] to have full motor strength, full range of motion in the spine and extremities, . . . equal reflexes, and negative straight leg raise testing" ignores two results that contradict that generalization:  Dr. Cremer found a limited range of lumbar spinal motion on October 16, 2003; and an examination at Portage on September 8, 2008 revealed lumbar flexion limited to 10 degrees without pain, positive right straight leg raising to 40 degrees without back pain, and positive left straight leg raising to 30 degrees without back pain.  Nevertheless, it is generally true that physicians other than Dr. Winer did not find a positive straight leg raise or limited range of spinal motion.  Third, Nickles is correct that ALJ Carissimi's comment that "Dr. Winer indicated that [Nickles'] straight leg test was positive at 90 degrees on the left, which is generally considered to be a negative straight leg test" is an expert medical opinion beyond the scope of the ALJ's role.  The ALJ is not a physician; any opinion as to whether pain upon a 90◦ pain raise is medically "normal" must come from a medical

20

professional, not the ALJ.

Nickles also objects that ALJ Carissimi fails to explain how Dr. Winer's opinions are inconsistent with his treatment notes.  While the ALJ's opinion is not a model of clarity in this respect, the ALJ nevertheless indicates sufficiently what prompted this criticism.  Dr. Winer's clinical notes record one definite instance of positive left leg raise upon testing, a positive response for pain at 90∘ on November 15, 2005.  His notes also contain the following reference on January 17, 2005, "[Nickles] does have positive straight leg raising on the left."  Tr. at 175.  It is unclear whether this refers to the positive result obtained on November 11, 2005 or to a test conducted on January 17, 2006.  In any case, the angle at which Nickles alleged pain is unspecified.  On November 15, 2005, Dr. Winer completed an RFC assessment in which he opined that Nickles could work for eight hours a day.  On April 25, 2006, Dr. Winer completed a second RFC assessment in which he opined that Nickles work for four hours in an eight-hour work day.  The only change that Dr. Winer made in the section headed "Objective signs of pain" was a notation of a positive left leg raise at 40∘.  That test result appears nowhere in Dr. Winer's clinical notes.  Thus, because the change in Dr. Winer's RFC assessment appears to be based on a leg raise result that is inconsistent with the test results recorded in Dr. Winer's clinical notes, the ALJ concludes that Dr. Winer's opinions are inconsistent with his treatment notes.

In addition, ALJ Carissimi supports his assertion that Dr. Winer's opinions are inconsistent with his treatment notes by referring to Dr. Brahms' testimony.  Tr. at 268. Dr. Brahms stated that Dr. Winer's assessment of Nickles' work capacity was not supported by objective findings.  Another way of saying this is that Dr. Winer's opinions

21

were inconsistent with his objective findings.  Nickles' argument in this respect is not well taken.

Nickles further objects that Dr. Brahms' testimony at the hearing is no more than a "'shot in the dark' guess" regarding the extent of Nickles' limitations.  Plaintiff's Brief, Doc. No. 14, p. 16.  That overstates the degree of uncertainty underlying Dr. Brahms' opinion.  After describing the objective evidence in the record and disagreeing with the degree of limitation found by Dr. Winer, Dr. Brahms was asked whether other patients with Nickles' conditions alleged similar subjective symptoms.  Dr. Brahms responded that the majority of patients with Nickles' conditions do not claim to be experiencing the degree of pain that Nickles' alleges, although some patients do.  In effect, Dr. Brahms said that although Nickles' conditions could produce the symptoms she alleged, the degree of symptoms alleged was somewhat unlikely.  This is more than a "'shot in the dark' guess" regarding Nickles' limitations.

Finally, Nickles contends that Dr. Brahms' opinion with respect to Nickles' RFC is inconsistent because, after viewing the MRI taken on September 2, 2008, he did not change his opinion regarding Nickles' RFC.  The MRI performed on September 2, 2008, showed "degenerative disc disease at L5-S1 with mild anterolisthesis and disc bulge extending into the neural foramina."  Tr. at 322.  The MRI also revealed a disc bulge at L5-S1 extending into both neural formina, accompanied by moderate bilateral facet hypertrophy, and mild bilateral neural foraminal narrowing.  There was also mild to moderate ligamentum flavum and facet hypertrophy at L3-L4 and L4-L5.  At the hearing, plaintiff's counsel presented to Dr. Brahms the results of that MRI, which had only recently been added to the record.  Dr. Brahms described the MRI as providing

22

evidence to support the data from the nerve conduction studies that Nickles suffered from radiculopathy.  He denied, however, that the new MRI caused him to change his mind regarding Nickles' RFC.

Nickles provides no medical opinion to support her assumption that the new MRI *should* have caused Dr. Brahms to change his opinion regarding Nickles' RFC.  Absent a competent medical opinion to that effect, Nickles is simply speculating that the MRI should have caused Dr. Brahms to change his opinion.   Nickles properly complained when the ALJ engaged in the same activity.  Thus, Nickles' contention that Dr. Brahms' opinion with respect to Nickles' RFC is inconsistent is not well taken.

To summarize, ALJ Carissimi gave lesser weight to Dr. Winer's opinions because they were not supported by sufficient objective medical data, were contradicted by other evidence, and did not explain the nexus between Dr. Winer's RFC assessment and the physical findings.  ALJ Carissimi's opinion contains factual errors and is marred by his unsupported medical opinion regarding a positive 90○ straight leg raise.  Nevertheless, his assertion that Dr. Winer's opinion is inconsistent with his own treatment notes, inconsistent with the record as a whole, and inadequately explained has substantial evidentiary support.  These are permissible reasons for failing to give the opinion of a treating physician controlling weight.  *See* 20 C.F.R. § 404.1527(d).  For these reasons, Nickles' argument that the ALJ failed to give proper weight to Dr. Winer's opinion is without merit.

*B.*     *Whether ALJ Carissimi improperly found Nickles not to be entirely credible*

Nickles also contends that ALJ Carissimi improperly found Nickles not to be entirely credible because he failed to give good reasons for doubting her credibility.

23

The ALJ may properly consider a claimant's credibility in weighing allegations of

pain.  *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  In the

Sixth Circuit, evaluations of credibility proceed by way of a two-pronged test:

> First, we examine whether there is objective medical evidence of an underlying
> medical condition.  If there is, we then examine: (1) whether objective medical
> evidence confirms the severity of the alleged pain arising from the condition; or
> (2) whether the objectively established condition is of such a severity that it can
> reasonably be expected to produce the alleged disabling pain.

*Id.* (quoting *Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994)).  If there is

objective medical evidence of an underlying condition but the objective evidence does

not confirm the severity of the alleged pain, the ALJ must consider the entire record in

assessing the claimant's credibility.  *Rogers v. Comm'r of Social Sec.,* 486 F.3d 234,

247 (6th Cir. 2007).  Factors relevant to consideration of the record include the

following:  (1) daily activities; (2) the location, duration, frequency, and intensity of pain

and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage,

effectiveness, and side effects of any medication taken to alleviate pain or other

symptoms; (5) treatment other than medications received for relief of pain or other

symptoms; (6) any measures used to relieve pain or other symptoms, such as lying

down; and (7) other factors concerning functional limitations and restrictions due to pain

or other symptoms.  20 C.F.R. § 404.1529.  "Discounting credibility to a certain degree

is appropriate where an ALJ finds contradictions among the medical reports, claimant's

testimony, and other evidence."  *Walters*, 127 F.3d at 532; *Hash v. Commissioner of

Social Sec.*, 981, 2009 WL 323101, at *9 (6th Cir. Feb. 10, 2009).

The ALJ is required to explain his credibility determination to permit review of the

ALJ's decision.    *Rogers,* 486 F.3d at 248.  Nevertheless, "an ALJ's findings based on

the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.*"* *Walters*, 127 F.3d at 531.

In the present case, the ALJ found that Nickles suffered from lumbar degenerative disc disease which could reasonably be expected to cause the alleged symptoms.  After discounting the opinion of Dr. Winer, he adopted the opinion of Dr. Brahms and concluded that the objective medical evidence did not fully support the severity of Nickles' subjective allegations of pain.  Thus, the ALJ was required to consider the entire record in evaluating the credibility of Nickles' allegations of pain.  He considered the consistency of Nickles' statements with respect to her pain and with respect to aggravating and alleviating factors.  He also considered the nature of Nickles' treatment, compliance with treatment, daily activities, and side effects of medication.  In finding Nickles not to be fully credible, the ALJ cited exaggeration of symptoms, inconsistent statements, and noncompliance with treatment as leading to this conclusion.

The ALJ gave as evidence of exaggeration Nickles' allegations of "excessive" pain despite failing to report such pain to her physicians and Dr. Brahms' testimony that the medical evidence regarding Nickles' back pain is "virtually benign."  Tr. at 269. Nickles mischaracterizes the ALJ's position as "there was [sic] no subjective complaints of pain in the record."  Reply, Doc. No. 14, p. 19.  She responds that Nickles reported experiencing pain a number of times and that the severity of pain varied from moderate to severe.  In particular, Nickles cites a report for Dr. Hampton on March 19, 2004 that her pain was typically 8 on a 10 point scale and a report to Dr. Tharp of pain at 8 on a

scale of 10 on September 11, 2008.  While Nickles misstates what the ALJ said, the

evidence she cites does contradict the ALJ's assertion that Nickles did not report

"excessive" pain to her doctors.

As evidence of inconsistent statements, the ALJ cited Nickles' statements that

Dr. Winer told her that she might need back surgery and that Drs. Hampton and Tharp

had recommended back surgery.  According to the ALJ, there is no indication in Dr.

Winer's treatment notes that he recommended surgery, and Drs. Hampton and Tharp

mentioned surgery as a possibility only if more conservative modes of treatment proved

ineffective.  Nickles responds that she never said that Dr. Winer suggested surgery.

The contradictory positions of Nickles and the ALJ may be explained by an ambiguous

entry in clinical notes for March 31, 2006:  "Has chronic back pain for which she sees

neurologist, Dr. Weiner [sic]. Was told she may have to have surgery on her low back."

Tr. at 366.  The entry is equivocal as to whether Dr. Winer or someone else mentioned

the possibility of surgery.  Nickles does not challenge the ALJ's statements with respect

to Drs. Hampton and Tharp.

The ALJ also noted as inconsistent Nickles' descriptions of the history of her pain

and aggravating factors.  Nickles usually stated that she had experienced lower back

and leg pain since the birth of her first child in 2002.  But she also stated that she began

experiencing leg and back pain since about May 2005 and, on another occasion, since

September 2005.  She also variously described the pain over that period as intermittent

on at least one occasion and chronic on other occasions.  At times, she described the

pain as aggravated by sitting, standing, walking, bending, and any other activity and

only relieved by lying down.  At other times, she described the pain as aggravated by

26

sitting, lying down, activity, and bending, but improved by standing and walking. Nickles does not respond to the ALJ's remarks regarding these inconsistent statements.

The ALJ also observed that Nickles had been given conservative treatment for her conditions and was not always compliant with that treatment. In particular, according to the ALJ, Nickles failed to attend physical therapy regularly as recommended by her doctors, variously using a death in the family and an increase in pain as the reasons for discontinuing therapy. On another occasion, however, Nickles admitted that physical therapy provided temporary relief from pain. Nickles does not respond to these comments by the ALJ.

Finally, Nickles objects to the ALJ's assertion that her daily activities were consistent with the ALJ's estimate of her RFC. The ALJ stated that Nickles' self-reports and the statements of a neighbor indicated that Nickles could care for three young children, lift and carry a 16-pound child, drive, shop, perform light household chores, care for pets, prepare meals, do laundry, and manage household finances. The ALJ concluded, therefore, that Nickles' allegation that she was incapable of any sustained work activity was not credible. Nickles' objection to this reasoning focuses solely on the ALJ's observation that Nickles "is able to lift and carry her six-month-old child who weighs 16 pounds." Tr. at 270. Nickles responds, "The ALJ construed Plaintiff's testimony making it sound like [sic] she lifts him on a frequent basis. However, the Plaintiff's testimony was quite clear that she picks him up 'when I have to.'" Reply at 19 (citation omitted). As the ALJ did not assert that Nickles could lift a 16-pound child frequently, Nickles' objection does not affect the force of the ALJ's reasoning or his conclusion.

27

Nickles' does not respond to most of the ALJ's reasons for finding her less than fully credible.  One of Nickles' claims that the ALJ committed a factual error in evaluating credibility was probably the result of the ALJ's and Nickles' construing differently an ambiguous statement in the record.  One other claim of error was the result of Nickles' misconstruing what the ALJ said.  Nickles' objections do not significantly undercut the ALJ's conclusion that Nickles was not fully credible.

The ALJ's evaluation of Nickles' allegations of pain comported with the two-pronged test used in the Sixth Circuit and included examination of the relevant factors suggested by the Regulations.  It fully described the ALJ's reasoning, detailing a series of inconsistencies among Nickles' statements and between her allegations of pain and her behavior.  From those inconsistencies, the ALJ drew the permitted conclusion that Nickles was not fully credible.  The ALJ's credibility determination, therefore, is supported by substantial evidence.  Nickles' contention that the ALJ Carissimi improperly found Nickles not to be entirely credible because he failed to give good reasons for doubting her credibility is not well taken.

C.    *Whether ALJ Carissimi erred in not accepting the opinion of the VE in response to the hypothetical question that included Dr. Winer's assessment of Nickles' RFC*

Nickles argues that ALJ Carissimi erred in not accepting the opinion of the VE in response to the hypothetical question that included Dr. Winer's assessment of Nickles' RFC.  According to Nickles, Dr. Winer was Nickles' treating physician, and his opinion was entitled to controlling weight.  Therefore, the ALJ should have accepted the VE's opinion in response to the hypothetical that included Dr. Winer's estimate of Nickles' RFC.  As has already been shown, however, the ALJ did not err in discounting Dr.

28

Winer's opinions and giving them less than controlling weight.  Instead, he found Dr.

Brahms' opinions to be more consistent with the opinions of other  examining and non-

examining physicians and with the record as a whole.  He, therefore, gave full weight to

that opinion.  Nickles does not show that Dr. Brahms' opinions were inconsistent with

the record as a whole, other than its inconsistency with Dr. Winer's second RFC

assessment.  Thus, Nickles fails to demonstrate that ALJ Carissimi's erred in giving full

weight to Dr. Brahms' opinion and accepting the VE's response based on that opinion.

For this reason, Nickles' assertion that the ALJ erred in not accepting the opinion of the

VE in response to the hypothetical question that included Dr. Winer's assessment of

Nickles' RFC is not well taken.

D.      *Whether ALJ Carissimi followed the court's orders on remand*

        Nickles does not explain or support her assertion that ALJ Carissimi failed to

follow the court's orders on remand.  Consequently, this contention is not well taken.

VII.  Decision

        For the reasons give above, the Commissioner's decision should be **AFFIRMED**.


Date:  April 9, 2012                         /s/ Nancy A. Vecchiarelli
                                             U.S. Magistrate Judge


**OBJECTIONS**

        **Any objections to this Report and Recommendation must be filed with the
Clerk of Courts within fourteen (14) days after the party objecting has been
served with a copy of this Report and Recommendation.  Failure to file objections
within the specified time may waive the right to appeal the District Court's order.
*See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v.
Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**